OPINION OF THE COURT
Robert F. Julian, J.
Dale R. (the respondent) seeks the appointment of an independent psychiatrist or, in the alternative, a consulting psychiatric expert for the examination of the respondent, a former Department of Correctional Services inmate now civilly committed to the Psychiatric Center based on his being diagnosed as a pedophile and consequently determined to be mentally ill. The underlying proceeding was initiated by petitioner Donald A. Sawyer, acting in his capacity as Executive Director of the Central New York Psychiatric Center, requesting an order, pursuant to Mental Hygiene Law § 9.33, for the involuntary retention of this respondent. Respondent is an involuntary patient at Central New York Psychiatric Center, having been admitted under the Mental Hygiene Law pursuant to psychiatric examinations conducted just before the completion of his sentence for sexual abuse in the first degree, and rape in the third degree. Respondent is a twice-convicted felon in each instance having sexually abused a minor. The petitioner seeks respondent’s retention asserting that he is a danger to others. The respondent initially applied to obtain the services of an independent psychiatric expert, and thereafter requested a consulting expert in the alternative. During the pendency of posttrial proceedings, the Court of Appeals rendered its decision in State of N.Y. ex rel. Harkavy v Consilvio (7 NY3d 607 [2006]) holding in a fact situation comparable to the case at bar that section 400 et seq. of the Correction Law is the preferable procedural route when the respondent is incarcerated.
The respondent in the case at bar contends that Correction Law § 402 (1), which requires a two-physician certificate that the inmate is mentally ill, thereby commencing the inmate’s transfer from a penitentiary to a secured psychiatric hospital, offers support for his argument that the court should appoint an independent medical examiner. The Correction Law does not exclude state employees from providing the two-physician certificates, and an Attorney General’s opinion holds that the opining physicians may be state employees, but they should not have treated or consulted about the inmate’s case, or have previously opined that the inmate “is insane.” (1950 Ops Atty Gen 156.) Such a threshold evaluation is offered to provide a basis for *720 pendente lite retention. As a matter of practice, the correctional facility provides the court with an order designating two physicians of its choice which the court routinely signs appointing the examiners to determine if the inmate should be transferred to a psychiatric facility. Transfer of the inmate patient and further proceedings then await the conclusions of those examiners. If they conclude the inmate patient should receive in-patient psychiatric care, a hearing can be requested pursuant to Correction Law § 402. The only case remotely passing upon the propriety of this arrangement is Matter of Lindner (71 AD2d 829 [4th Dept 1979], revg 96 Misc 2d 234 [Sup Ct, Oneida County 1978]). In Lindner, the Appellate Division with one dissenter overturned the trial court’s finding that Correction Law § 402 (9) was unconstitutional (the so-called emergency provision). (See also, People ex rel. Overton v Director of Cent. N.Y. Psychiatric Ctr., 99 Misc 2d 1116 [Sup Ct, Oneida County 1979].)
The question before this court is quite different and not analogous. The question at bar is the same whether the proceeding is brought pursuant to section 402 of the Correction Law or section 9.33 of the Mental Hygiene Law, i.e., is this court required to appoint an expert, either independently or in a consulting capacity?
In the case at bar, the respondent was required to make a specific showing by a relevant professional that there were significant psychiatric or psychological issues which would warrant the appointment of either an independent or consulting expert. The court authorized this application to be submitted ex parte as that same practice is followed in comparable situations in criminal cases seeking judicial permission to hire an expert retained for trial purposes. (See Judiciary Law § 35 [1] [a], and by analogy § 35-b [8].) Respondent submitted the sworn affidavit of Charles Massoud-Tastor, a licensed master social worker in the employ of Mental Hygiene Legal Service. This showing by respondent demonstrates significant issues so that the granting of the motion for the appointment of a consulting psychiatric expert to aid in respondent’s defense is indicated to satisfy due process. The court declines to appoint an independent expert at this juncture for the reasons set forth below.
In support of his motion, respondent relies on the reasoning of the Second Circuit in Goetz v Crosson (967 F2d 29 [2d Cir 1992]). In that case, the attorney for an involuntarily detained psychiatric patient sought the assistance of both consulting and independent psychiatric experts in order to fully represent his *721 client at a retention hearing. It was alleged that, where the liberty interests of an indigent patient were at stake, the provision of these psychiatrists to aid in his defense was constitutionally required; furthermore, it was claimed that the failure to provide said experts violated the Due Process Clause of the Fourteenth Amendment. The Second Circuit defined a consulting psychiatrist as one who “would testify on behalf of the patient at a commitment or retention hearing ‘if the psychiatrist believes [the patient’s] clinical condition warrants such testimony’; and . . . would assist counsel in the preparation of the patient’s case, whether or not he or she believed that commitment or retention was appropriate.” (Goetz at 31.)
The Second Circuit recognized that
“[b]ecause significant liberty interests are at stake, involuntary civil commitment must satisfy due process ... as guided by three factors: (i) the interests of the individual subject to involuntary commitment; (ii) the governmental interest affected by the provision of additional safeguards; and (iii) the risk of erroneous deprivation of the individual’s interests without additional safeguards, and the probable value, if any, of such additional safeguards.” (Id. at 33.)
The Second Circuit found this third factor most persuasive in its analysis, assessing whether refusing to provide a consulting psychiatrist would deprive the patient of a necessary safeguard against erroneous commitment, while weighing that against the unique role of civil commitment in protecting both society at large and the individual himself from any possible danger posed by the individual’s mental illness. The Massoud-Tastor affidavit raises a significant question as to the diagnosis and prognosis with regard to (iii) above. Due process requires the granting of the application for the appointment of a consulting psychiatrist. Mr. Massoud-Tastor, in his affidavit, claims that discrepancies and disputes exist with respect to the scientific scales which the state psychiatrists have used to determine respondent a threat to himself and others. Moreover, Mr. Massoud-Tastor also holds that certain diagnoses, assigned by the state psychiatrists to respondent, are not reflected in respondent’s history and current mental state.
The Second Circuit concluded that “the due process clause does not require a state to provide an indigent patient with a consulting psychiatrist in every commitment or retention proceeding. . . . [the functions of a consulting psychiatrist] are *722 not of sufficient import to implicate due process in every proceeding.” (Id. at 34.) In making this assessment, the Second Circuit examined the probable role of a consulting expert at a retention hearing, while also examining the procedures set out by the Legislature for the provision of independent psychiatric experts at a retention hearing. Ultimately, the Second Circuit held that the Due Process Clause did not grant an absolute right to a consulting psychiatrist for the purpose of assisting counsel in preparation for a commitment or retention hearing. (Id. at 36.) The court expanded on that holding that “there may be a limited number of cases in which counsel can show by affidavit a compelling fact-specific need for a consulting psychiatrist to educate counsel in particular aspects of a case.” (Id. at 35. )
The Second Circuit stated that a retention hearing was not purely adversarial in nature, unlike an ordinary trial, where “battles of the experts” were commonplace. The Second Circuit also stated that, unlike civil or criminal trials, retention hearings were meant to respect the interest of the state in protecting its citizens and the individual from the possible harmful effects of serious mental illness while also respecting the liberty interest of the individual against erroneous confinement. (Id. at 36. ) Therefore, the Second Circuit in Goetz found that the appointment of a consulting expert would be redundant, in view of the proposed role at trial of a consulting expert, when the opinion of an independent expert would provide a similar role and where the provision of an independent psychiatrist was available as a matter of judicial discretion.
Unlike the court in Goetz, this court opts for the appointment of a consulting expert rather than an independent expert because the existence of pedophilia as a DSM-IV-R diagnosis (Diagnostic and Statistical Manual of Mental Disorders [4th ed]) is sufficiently controversial within the medical community that the act of hiring an independent consultant places the court unnecessarily into the controversy. For example, an American Psychiatric Association symposium in 2002 debated whether pedophilia, as well as other paraphilias, should be removed from the DSM as a psychiatric illness. Dr. Charles Moser and Dr. Peggy J. Kleinplatz, in a paper presented at that conference entitled DSM-IV-TR and the Paraphilias: An Argument for Removal, in the December 2002 Archives of Sexual Behavior, argued for the removal of pedophilia from the DSM-IV-TR, asserting that the status of pedophilia is not that of psy *723 chiatric disorder. Similar arguments were in the same issue of the Archives of Sexual Behavior by Richard Green and Gunter Schmidt. Twenty-one peer reviewers gave their divided impressions of the articles on the matter of removing pedophilia as a mental disorder further indicating the existence of several schools of thought. The contrary argument to Moser and Kleinplatz was made in the same journal by Dr. Robert Spitzer (see Special Section, Pedophilia: Concepts and Controversy, 31 Archives of Sexual Behavior [No. 6] 465-510 [Dec. 2002]). There are also articles in the medical literature theorizing that pedophilia in older men may be secondary to brain lesions or other brain disease, a summary of certain of those articles is recited by Dr. Mario F. Mendez et al. in an article entitled Pedophilia and Temporal Lobe Disturbances (12 J Neuropsychiatry & Clinical Neurosciences 71-76 [2002]).
Thus, although the statutory law of the state recognizes all the DSM-IV-R diagnoses as authoritative, it is a question of fact whether a DSM diagnosis is applicable to a specific patient.* Because we are a common-law system of jurisprudence and not a civil law system, the court should maintain its neutrality until it hears proof from both sides. For example, the respondent nominates Dr. Damien Vallenlonga as an independent expert. To properly appoint Dr. Vallenlonga, the court would be required to vet this physician’s credentials to determine if he has chosen philosophical sides in the above-mentioned clinical debate. If he has, he may not be neutral and thus would be better suited to appointment as a consulting expert. Thus, the very selection of the independent expert can be tantamount to the court choosing sides in a circumstance wherein it is likely that many psychiatrists subscribe to one school of thought or the other. The prudent course for this court is to opt for an independent expert only if there are specific questions raised by the proof presented by the consulting experts for both sides. The parties should battle in open court utilizing experts so that the trier of fact may make a truly independent judgment, unfettered at *724 least initially by the burden of having selected one of those testifying experts.
This view is supported by scholarly legal journals which have considered similar problems raised by Federal Rules of Evidence rule 706 which allows federal judges to appoint a court’s expert. A number of commentators have found the notion of a court’s expert to be a flawed concept because the judge is not usually positioned to select a truly independent expert: “If the Court seeks to appoint such an expert, it is necessary to inquire whether the Court is in a position to know whether the appointed expert is better or more impartial than the experts retained by the parties.” (See Saltzburg, The Unnecessarily Expanding Role of the American Trial Judge, 64 Vir L Rev 1, 77 [1978].)
Schuck has noted that the employment of court-appointed experts
“has value only where a fact of a scientific nature can be ascertained with some degree of definitiveness by one well versed in the field. If on the other hand there is any substantial room for interplay of theoretical attitude . . . then it is virtually impossible to find a ‘neutral’ expert and the very selection of the man usually will predetermine what his ultimate opinion will be and is ‘tantamount’ to a selection of the answer to the problem.” (See, Schuck, Techniques for Proof of Complicated Scientific and Economic Facts, 40 FRD 33, 38-39 [1967]; see also, Griffin, Impartial Medical Testimony: A Trial Lawyer in Favor, 34 Temple L Q 402, 409, 411 [1961]; references cited in 2 Graham, Handbook of Federal Evidence, at 693-694 [5th ed 2001].)
Judiciary Law § 35 (4) provides, “In any proceeding . . . when a person is alleged to be mentally ill, mentally defective . . . the court which ordered the hearing may appoint no more than two psychiatrists ... to examine and testify at the hearing upon the condition of such person.” Indeed, the Second Circuit in Goetz agreed that “[s]ome proceedings may present a need for [additional] independent psychiatric testimony ... to ensure an accurate decision. . . . limited to cases in which the presiding judge determines that the record leaves unexplored or unanswered questions and that additional psychiatric testimony is necessary” (at 36). Therefore, it is a matter of judicial discretion whether or not to appoint an independent expert. (Quiet *725 Technology DC-8, Inc. v Hurel-Dubois UK Ltd., 326 F3d 1333, 1348-1349 [11th Cir 2003]; 29 Charles Alan Wright and Victor James Gold, Federal Practice & Procedure § 6304, at 465 [1997]; United States v Michigan, 680 F Supp 928 [WD Mich 1987]; John C. Klotter and Jefferson L. Ingram, Criminal Evidence, at 377-378 [8th ed 2003].)
The court in Goetz reasoned, in the absence of a consulting expert, that “[the patient’s] right to a testifying psychiatrist ... is fulfilled so long as constitutionally adequate procedures exist for the appointment of an independent psychiatrist” (at 35). The court did not arrive at this conclusion as a result of weighing the preferability of one versus another, but rather from the concept that some protection for the individual’s liberty interests against erroneous confinement should exist where an issue is raised. (Id. at 36.)
Respondent’s motion to appoint an independent expert is denied, with reservation that should a factual situation arise during this litigation where the court feels such an expert is required, there is discretion under Judiciary Law § 35 (4) to appoint such an independent expert. However, the appointment of a consulting expert is required in this case to protect the respondent’s liberty interests and is hereby ordered.

 Several terms defined in the Mental Hygiene Law depend on definitions found in the “most recent edition” of the DSM-IV (Mental Hygiene Law § 1.03 [52], [53], [54]). For example, Mental Hygiene Law § 1.03 (52) defines persons with serious mental illness as individuals with a “designated diagnosis of mental illness under the most recent edition of the [DSM-IV].” A designated mental illness diagnosis is further defined as a DSM-IV diagnosis (14 NYCRR 512.4, 587.4 [a] [5]). Therefore, by law, to determine if the patient has a mental disorder, the court must take judicial notice of and apply the DSM-IV-R.